UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HUSSEIN NAZZAL,

                Petitioner,                Criminal Case Number 10-20392

v.                                      Civil Case Number 16-13240
                                      Honorable David M. Lawson

UNITED STATES OF AMERICA,

                Respondent.

_____/

## OPINION AND ORDER DENYING MOTION TO VACATE SENTENCE

Following a jury trial, petitioner Hussein Nazzal and his co-defendant (and former attorney) Edward Schneider were convicted on multiple charges of bank fraud, bribery, and creating false records. The convictions were based on Nazzal's orchestration of a "loan jumping" and mortgage fraud scheme over the course of several years involving numerous commercial loan transactions. He received a below-guidelines sentence of 110 months in prison and was ordered to repay more than $1.9 million in restitution. The convictions and sentence were affirmed on appeal. *United States v. Nazzal*, 607 F. App'x 451 (6th Cir. 2015). On September 9, 2016, Nazzal filed a motion to vacate his sentence under 28 U.S.C. § 2255, in which he argues that his trial counsel was ineffective by failing to investigate potential witnesses, coming unprepared for trial and presenting no defense, "coercing" him not to testify, and failing to file a brief in support of a mid-trial motion for judgment of acquittal on one charge. Because none of his claims justifies the relief that he seeks, the Court will deny the motion.

I. Facts and Proceedings

The Sixth Circuit included the following comprehensive recitation of the factual and procedural background of the case in its opinion affirming the petitioner's convictions:

Over several years, Hussein Nazzal and his attorney, Edward A. Schneider, conspired with others to defraud Detroit-area banks using fraudulent financial documents. They also bribed a bank officer to approve loans for unqualified third parties and took steps to conceal their crimes. The jury convicted on all counts, and each received a below-Guidelines sentence. . . .

## I. Factual & Procedural History

Nazzal was a Dearborn, Michigan businessman who facilitated bank loans for others and also made his own "hard money loans" — i.e., high-interest loans to borrowers who could not otherwise obtain them. Over a six-year period beginning in 2003, Nazzal orchestrated three wide-ranging bank fraud schemes in the metropolitan Detroit area. To accomplish his frauds, Nazzal conspired with several people, including his attorney (co-defendant Edward Schneider), a title company vice president (co-defendant Ross Carey), and a bank loan officer who later became a witness against the defendants (co-defendant Eric Morton). Nazzal also recruited borrowers and directed others to procure loans on his behalf. During the conspiracy, these individuals obtained millions in fraudulent commercial loans from several banks.

### A. Fifth/Third Bank Frauds (Counts 1–3)

Fifth/Third prohibited payment of broker's fees from loan proceeds. To circumvent this prohibition, Nazzal regularly bribed loan officer (and testifying co-defendant) Eric Morton to approve loans for unqualified borrowers. In these "straw buyer" transactions, Nazzal would then submit fraudulent payoff letters for mortgages and pre-existing liens — when none existed — so that he or one of his companies could obtain payments at the respective closings. Only some of these transactions were presented at trial as examples. Those relevant to this appeal are discussed below and referenced by street address.

### 1. 7845 Wyoming

In this straw buyer transaction, Nazzal engineered a loan for Mountif Zeaiter, a sporadically employed and otherwise unqualified borrower. In order to get Fifth/Third's approval for this $345,000 loan, Nazzal gave Morton false tax returns greatly inflating Zeaiter's income. Schneider prepared the paperwork and was present at the meeting when Zeaiter signed the documents. Schneider also prepared a purchase agreement (that was faxed from his law office) falsely stating that Zeaiter had given the seller $5,000 in earnest money.

Schneider was also present at the loan closing. Although the documents required Zeaiter to pay approximately $18,000 at closing, he later testified that he never paid anything. Nazzal also submitted a fraudulent payoff letter for $12,000 — in reality just a disguised fee for his brokering the loan. After the closing, Nazzal paid Schneider with a $500 cashier's check and gave Morton $3,500 cash.

### 2. 8725 Livernois

Nazzal again brought a straw buyer to Morton and again obtained a "brokerage" fee at closing in violation of Fifth/Third policy. The closing on this $320,000 loan took place at Minnesota Title Agency, whose president (and co-defendant) Ross Carey later testified that Schneider was associated "whenever there was a closing involving [Nazzal]." In this deal, Schneider served as a "witness" on the purchase agreement, which falsely indicated that the borrower was making a $100,000 down payment on the property. Nazzal obtained nearly $15,000 at the closing.

### 3. 9700 & 9701 Van Dyke

Nazzal directed Morton to falsify the borrowers' financial statements for a $612,000 commercial loan secured by the 9701 property. Schneider signed a fraudulent payoff letter as the "Treasurer" of Alter Investments, falsely stating that the company had a prior mortgage on the property. This letter was faxed from Schneider's law office. At the closing, Fifth/Third paid Alter Investments $22,000 to clear title and Schneider received $2,588 in attorney's fees. Nazzal also paid Morton over $1,000 for assisting with this transaction.

For a $550,000 loan on the 9700 property, Nazzal provided another fraudulent payoff letter for $48,000 — again, where no prior lien existed. The transaction resulted in a payment of nearly $28,000 to G&S Development with an additional payment of $500 to Schneider.

### 4. 12803 Hamilton

Two brothers had fallen behind on a construction loan for a gas station. During court proceedings, they happened to meet Nazzal and Schneider, who were at the courthouse that day on another matter. The brothers eventually obtained alternate financing from Nazzal. When this loan came due, they planned to sell their gas station and pay Nazzal with the proceeds.

After the sale fell through, one owner agreed to buy the property from his brother so that Nazzal would get paid out on time. This last-minute deal also required an emergency payment to Morton, who had spent considerable time getting his superiors at Fifth/Third to approve the transaction. In advance of the closing, Schneider gave Morton a $1,000 check drawn from his law firm's trust account. Morton falsely wrote "payback previous personal loan" in the memo line of the check. He later testified unequivocally that he received this payment as a bribe.

The brothers and Nazzal disputed various payoffs and fees prior to closing. Schneider signed one fraudulent payoff letter for $549,000 as the "Treasurer" of G&S Development. The parties also disputed payment of $1,750 in purported "attorney's fees" to Schneider. Both brothers later testified that they "never hired" Schneider for the closing; they believed he represented Nazzal.

### B. Comerica Bank Fraud (Count 5)

Nazzal defrauded Comerica using a so-called "lien jumping" scheme. Hours after closing on a $1 million loan with Comerica for a gas station, co-defendant Majed Tawbe executed a fraudulent, handwritten $500,000 mortgage on the same property in Nazzal's favor. Nazzal then managed to record this bogus mortgage several days before Comerica recorded its legitimate one. After Tawbe defaulted on his loan and fled the country, Comerica attempted to foreclose and learned of Nazzal's prior recorded lien. Comerica and its title insurance company, First America Title, were thus required to initiate legal proceedings to quiet title. Eventually, First America Title agreed to pay Nazzal $135,000 to release his fraudulent lien.

C. Standard Federal Bank Fraud (Count 7)

In March 2004, co-defendant Farouk Harajli obtained a $3 million loan from Standard Federal. Because part of this loan was secured by a gas station he owned, he promised not to obtain any secondary financing on that property or borrow any additional funds without Standard Federal's consent.

Later that spring, Harajli was involved in a contested divorce and turned to Nazzal for a short-term $100,000 loan. Because Harajli's wife co-owned most of his businesses, the court required her consent for all financial transactions — but she refused to sign off on the loan from Nazzal. To solve this problem, Nazzal proposed to falsify a Power of Attorney permitting Harajli to sign various business documents on his wife's behalf. Schneider prepared the document, Harajli forged his wife's signature, and Nazzal loaned him the $100,000.

When Harajli approached Nazzal for another loan, Nazzal performed a title search on Harajli's properties and discovered that Standard Federal had not recorded its $3 million mortgage on the gas station. Nazzal then took steps to drain the equity from the property by recording two bogus mortgages totaling $750,000. Schneider prepared both documents, which were notarized by his wife.

Harajli eventually defaulted on his $3 million loan from Standard Federal. When Nazzal falsely claimed to have no knowledge of this loan, Standard Federal was forced to file an action to quiet title. Under Michigan's recording statute, any prior knowledge of Standard Federal's mortgage would have been fatal to Nazzal's claim to be first in line on the property. Nazzal therefore testified falsely — and also arranged for Harajli to testify falsely — that he had no knowledge of this pre-existing mortgage. In a further effort to make his claims seem legitimate, Nazzal arranged for co-defendant Carey of Minnesota Title Agency to backdate a check showing Nazzal's "prior" acquisition of a title insurance policy with respect to his bogus mortgages. Nazzal also encouraged Carey to testify falsely to the same during a deposition and at trial.

Nazzal eventually prevailed in the quiet title suit and was awarded $750,000 — undoubtedly due to the perjured testimony. Between paying the judgment and attorney's fees, Standard Federal Bank (by then Bank of America) and its commercial title company lost nearly $1 million.

### D. Falsification of Records (Count 8)

Nazzal also engaged in several activities to avoid discovery. Eric Morton testified that when Nazzal feared their scheme would be uncovered, Nazzal told him they had "to keep [their] stories straight . . . that [Morton] was not bribed, [and that] the loans were above board . . . things along that line." Nazzal similarly directed both Morton and Farouk Harajli to create affidavits and other documents falsely exonerating Nazzal from any wrongdoing. FBI agents recovered these papers along with many of the false tax returns used in the bank fraud schemes in a safe at Nazzal's house during the execution of a search warrant. Co-defendant Carey later testified that after the execution of this warrant, Nazzal told him to lie in order "to keep [their] stories straight."

Schneider also played a role in the cover-up. At least three of Morton's false written statements were notarized by employees at Schneider's law office. Despite Schneider's $1,000 payment to Morton in connection with the 12803 Hamilton transaction, these documents falsely stated that Morton had never been bribed by Nazzal or any other person. Additionally, Schneider later told an FBI agent that he had never been an officer or partner of any of Nazzal's companies — even though he had signed two fraudulent payoff letters as "Treasurer."

### E. Convictions & Sentencing

The jury convicted Nazzal on all indicted counts: conspiracy to defraud Fifth/Third, Comerica, and Standard Federal in violation of 18 U.S.C. § 1349 (Counts 1, 5, and 7); bank fraud against Fifth/Third in violation of 18 U.S.C. § 1344 (Count 2); corruptly giving Fifth/Third employee Eric Morton money in connection with bank transactions in violation of 18 U.S.C. § 215 (Count 3); and falsification of records in a federal investigation in violation of 18 U.S.C. § 1519 (Count 8). He received a below-Guidelines sentence of 110 months.

The jury also convicted Schneider on Counts 1 and 7. As to Count 3, the jury found him guilty of the lesser-included offense of making an illegal payment of only $1,000 (for his payment to Morton in connection with the 12803 Hamilton transaction). He received a below-Guidelines sentence of 48 months.

*United States v. Nazzal*, 607 F. App'x 451, 452-56 (6th Cir. 2015) (footnotes omitted).

On appeal, the Sixth Circuit rejected on the merits the petitioner's arguments that (1) two notes conveyed to the Court by jurors indicated that they were not impartial or had engaged in premature deliberations, (2) the Court erred by failing to hold a hearing to examine whether the jury was subject to any bias, (3) the calculation of the loss amount by the Court at sentencing was "purely speculative," (4) the Court improperly applied a four-point sentencing enhancement for

the petitioner's leadership role in the mortgage fraud scheme and a two-point enhancement for obstruction of justice, (4) the Court failed to consider all of the relevant sentencing factors under 18 U.S.C. § 3553(a) because it never mentioned the petitioner's age or health during its discussion on the record, and (5) the Court erred by failing to rule on the petitioner's mid-trial motion for a judgment of acquittal on Count 8 of the indictment (falsification of records), after the petitioner passed on the Court's invitation to file a brief in support of the motion and did not raise any objection to the conviction at sentencing. The petitioner filed a petition for a writ of *certiorari* in the Supreme Court, which was denied. *Nazzal v. United States*, 136 S. Ct. 130 (2015).

The petitioner timely filed his section 2255 motion. The government has responded to the motion and the petitioner filed a reply. In his motion, the petitioner raised three grounds for relief. In each he contends that his trial counsel was ineffective in various respects: (1) by failing to file any post-trial brief in support of a mid-trial motion for judgment of acquittal on Count 8 of the indictment, which charged falsification of records, (2) by failing to object to the Court's curative instructions given in response to two notes from the jury regarding their questions about the proceedings, and by failing to insist on a hearing to inquire about juror bias and premature deliberations, and (3) by coming "unprepared for trial" and "presenting no defense," declining the petitioner's urgings to investigate witnesses and evidence, and "coercing" the petitioner not to testify. Embedded in the third ground for relief was a list of nine specific instances of deficient representation, which are discussed further below; two of those points are duplicative of and incorporate by reference the arguments in support of the first two grounds for relief, which separately are addressed below.

The petitioner filed two supplemental briefs pointing out additional case law and a third supplement purporting to raise a "fourth ground for relief," in which he argues that the Court

improperly awarded restitution to the banks that issued the loans, because "the loans were phoney," and the banks participated in the fraud scheme by not demanding "evidence of the financial sufficiency of the mortgagees," so the banks therefore did not qualify as "victims" under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A.

## II. Discussion

A federal prisoner challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998). However, a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). Claims of ineffective assistance of counsel are properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

## A. Ineffective Assistance

To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). An attorney's performance is deficient if "counsel's representation fell below an objective standard of

reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). One way of establishing defective performance is to show that defense counsel missed a meritorious argument under the controlling law. However, the failure to file a meritless motion or raise a groundless objection does not constitute defective performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (6th Cir. 2011) (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (reiterating that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In a federal habeas proceeding, when the Court weighs a claim of ineffective assistance, "[a]n evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief" on his claim. *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (quotations omitted). "Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims," but "[a] petitioner's mere assertion of his innocence, without more, does not entitle him to an evidentiary hearing." *Ibid.*

Where the record presents "considerable doubt" about the interactions of a petitioner and his attorney, the Court should conduct an evidentiary hearing to bring clarity to the proceedings. *See Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003). However, where the existing record

demonstrates that claims of ineffective assistance are unsupported, or that the petitioner has not met the *Strickland* standard, no hearing is required. *Goward v. United States*, 569 F. App'x 408, 412 (6th Cir. 2014). A hearing in this case is not necessary to address Nazzal's ineffective-assistance-of-counsel claims because the record amply demonstrates their lack of merit.

### 1. Motion for Judgment of Acquittal

In his first claim for relief, Nazzal argues that his trial counsel was ineffective by failing to file any post-trial brief in support of a mid-trial motion for a judgment of acquittal on Count 8 of the indictment, which charged falsification of records. After the government rested its case, defense counsel made an oral motion for a judgment of acquittal on Count 8 under Rule 29 of the Federal Rules of Criminal Procedure. Trial Tr. Vol. XII at 227, ECF No. 243, PageID.4373. As the Sixth Circuit observed, that charge concerned Nazzal's solicitation of several written sworn statements from his co-defendants Morton and Harajali falsely exonerating him from any involvement in the mortgage fraud enterprise. The basis of the motion was that the evidence did not establish that the petitioner was aware of any active federal investigation when the alleged falsification of documents occurred.

When the Court asked defense counsel if he had any case law to back up the argument, he replied that he did not. The government responded that the controlling decisions on point have held that a defendant can be convicted based on intent to interfere with a contemplated future investigation, even where no active investigative was underway when false documents were created. *United States v. Kernell*, 667 F.3d 746, 753 (6th Cir. 2012) ("[There are] three scenarios under which [18 U.S.C. § 1519] would apply: (1) when a defendant acts directly with respect to 'the investigation or proper administration of any matter,' that is, a pending matter, (2) when a defendant acts 'in . . . contemplation of any such matter,' and (3) when a defendant acts 'in relation to . . . any such matter,' [and under this reading] '[t]he statute . . . does not allow a defendant to

escape liability for shredding documents with intent to obstruct a foreseeable investigation of a matter within the jurisdiction of a federal agency just because the investigation has not yet commenced.'" (quoting *United States v. Yielding*, 657 F.3d 688, 711 (8th Cir. 2011))).  The government also insisted that there was testimony in the record from a bank official and a federal agent showing that a federal investigation into alleged bank fraud involving Fifth/Third Bank had been opened in January 2008, before the false affidavits were created.

The Court took the motion under advisement and sent Count 8 to the jury.  After the verdict was returned, the Court set a deadline of April 13, 2014 for the petitioner to file a brief in support of the motion.  Trial Tr. Vol. XIV at 10, ECF No. 245, PageID.4567 ("There is a Rule 29 motion that is under advisement. If the Defendants wish to brief the issues raised, I'll set a deadline of April 13 to file briefs. If no briefs are filed by that date, I will simply proceed to decide the motion.").  It is undisputed that the petitioner's attorney never filed any brief or raised any objection at sentencing to the fact that the motion remained pending and was not ruled upon by the Court after trial.  On appeal, the Sixth Circuit rejected the petitioner's challenge to the Court's failure to adjudicate the motion, finding that it had been abandoned.

This claim is without merit because the petitioner has not identified any grounds on which the motion for a judgment of acquittal should have been granted that could have been advanced in post-trial briefing by counsel.  As the government pointed out during the mid-trial argument, it is settled under the controlling law that a defendant can be convicted under section 1519 where he acts in contemplation of a prospective future investigation with the intent to obstruct it by creating false documents.  There was ample evidence at trial to indicate that Nazzal acted with such an intent when he solicited false affidavits from his co-defendants.  The petitioner has not identified any other arguable ground on which the motion could have been advanced via further post-trial

briefing by counsel.  And counsel cannot be faulted for not pressing a meritless motion or raise a

groundless objection.  *Jalowiec*, 657 F.3d at 321-22; *Knowles*, 556 U.S. at 123.

The petitioner's first claim is without merit.

### 2. Failure to Object to Curative Instructions or Demand Hearing on Juror Bias

In his second claim for relief, the petitioner attempts to renew a challenge to the handling

by the Court of two notes conveyed by the jury during the trial.  The Sixth Circuit addressed the

claim on appeal as follows:

> Nazzal and Schneider first take issue with two notes submitted by the jury during trial. The first expressed confusion about the prosecution and defense teams working together in presenting certain exhibits. The second stated: "I have many questions concerning legal terms and laws. During deliberations, will we have someone available to answer these types of questions?" Nazzal and Schneider claim these notes demonstrate that the jury lacked impartiality or conducted premature deliberations and thus deprived them of a fair trial in violation of the Sixth Amendment.

> Their argument fails because the district court addressed both notes and issued curative instructions with both Nazzal and Schneider's blessing. As to the first note, the court explained the benefits of professionalism and that it had directed the sides to cooperate with each other in presenting certain documentary evidence. Concerning the second note, the court informed the jury that it would have the opportunity to ask legal questions during deliberations. Both Nazzal and Schneider expressly agreed with these instructions; they neither objected nor moved for a mistrial. Accordingly, we find no Sixth Amendment violation. *See United States v. Perry*, 438 F.3d 642, 651 (6th Cir.2006).

> Nazzal and Schneider further argue that the district court should have conducted a *Remmer* hearing to address any possibility of a biased jury. *See Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) ("In a criminal case, any private communication, contact or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, presumptively prejudicial."). A *Remmer* hearing, however, is only required in cases involving actual outside or improper contact with jurors or extraneous information contaminating the deliberation process. *See United States v. Ford*, 761 F.3d 641, 654-55 (6th Cir.2014). There were no such influences here.

*Nazzal*, 607 F. App'x at 456.

The petitioner's argument that his counsel was ineffective by failing to demand a *Remmer* hearing is foreclosed by the Sixth Circuit's holding that no such hearing was required under the circumstances, where there was no indication in the notes, or anywhere else in the record, that the jury was subjected to any improper extrinsic influence. Counsel cannot be deemed ineffective for failing to advance a groundless argument, *Jalowiec*, 657 F.3d at 321-22; *Knowles*, 556 U.S. at 123, and, moreover, "[a] § 2255 motion may not be used to re-litigate an issue that was raised on appeal absent highly exceptional circumstances." *Dupont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996). No exceptional circumstances exist here.

The petitioner's argument that the notes indicated "premature deliberations" by the jury that warranted an objection by counsel or further inquiry by the Court also is without merit, because nothing in the terse missives indicated that the jurors had disregarded the Court's express and repeated instructions not to discuss the case among themselves. The first note merely indicated that the jury was curious about "cooperation" between the parties, and it did not indicate that any discussion about the merits of the case had begun. The second note, evidently written or instigated by a single juror, merely suggested that one juror had "many questions concerning legal terms and laws," and asked if those questions could be addressed. Nothing in that second note indicates that it was the product of any discussions among jurors about the evidence or the issues presented, or even, as indicated by the use of the first-person pronoun, that the note was the product of anything more than the individual curiosity of a single juror. Neither of the notes indicates that the jurors actually engaged in any premature deliberations, and defense counsel's decision not to pursue any further objection or demand for inquiry therefore was reasonable. *United States v. Starnes*, 552 F. App'x 520, 523-24 (6th Cir. 2014) ("The note and questions asked therein do not actually indicate any pre-deliberation discussions. . . . While the questions might be the product of discussions

among jurors there was no particular reason to believe that they were and [the notes] only suggested that individual jurors were wondering about particular evidence. Further, using the collective pronoun did not necessarily imply discussion among jurors. [Moreover, there is a] strong basis to conclude that the juror questions were not the product of premature deliberations [because] the character of the note on which the juror questions were written indicates that the questions came from two separate jurors acting independently.").

Moreover, the Court repeatedly instructed the jurors not to discuss the case among themselves, and "jurors are presumed to follow the trial court's instructions." *United States v. Bradley*, 917 F.3d 493, 508 (6th Cir. 2019) (quotations omitted). There is no indication in this record that the jurors disregarded the Court's instructions, and there was no ground on which reasonable counsel should have demanded any further curative instructions than were given by the Court in response to the notes.

The petitioner's second claim premised on failure to object to the curative instructions or to demand an inquiry into juror bias is without merit.

### 3. Failure to Prepare for Trial or to Present a Defense

In his third ground for relief, the petitioner argues that his trial attorney was ineffective by nine specific failures of performance. Two of those instances of allegedly deficient performance are the same failures already addressed above, which the petitioner merely incorporated by reference from his arguments on grounds one and two. He identifies seven other instances of allegedly deficient performance where he asserts that counsel: (1) failed to investigate, interview, or call any witnesses at trial, (2) presented no evidence at trial, (3) due to lack of preparation, failed to present a defense, (4) failed to communicate with the petitioner "to discover potential lines of defense," (5) refused to prepare the petitioner to testify in his own defense and "coerced" him not to testify, (6) failed to move for a severance so that co-defendant Edward Schneider could be called

as a defense witness, and (7) failed to interview unidentified "tax preparers" whose testimony would "show [that] Nazzal never presented false tax returns."

### i. Failure to Investigate or Call Potential Witnesses

As an initial matter, the petitioner's arguments (1), (4), and (7) noted above, which are premised on alleged failures by trial counsel to investigate or interview witnesses or to explore "potential lines of defense," are entirely undeveloped and unsupported by any factual basis. Nazzal contends that he gave his attorney the names of potential witnesses, several of whom he identified merely by their names and positions that they held with the subject banks, title agencies, and other entities. Def.'s Mot. at 11, ECF No. 263, PageID.4957. He has not offered any affidavits from any of those witnesses or pointed to any information to suggest what the substance of their testimony would have been or how they could have aided his defense.

Prevailing professional norms require that an attorney either must investigate a known potential witness or make a reasonable decision that investigating a witness is not necessary. *Hawkins v. Coyle*, 547 F.3d 540, 548 (6th Cir. 2008). "The failure to call favorable witnesses can amount to ineffective assistance where it results in prejudice to the defense," *Pillette v. Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010), but the Court "must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy," *Cathron v. Jones*, 77 F. App'x 835, 841 (6th Cir. 2003) (citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)). However, "[w]here counsel fails to investigate and interview promising witnesses, and therefore 'has no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992) (quoting *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). But "[w]ithout producing or otherwise detailing the [potential] witnesses' testimony, the defendant's claim essentially relies on 'speculation about what unidentified persons

might have said,' and such a showing fails to carry [the defendant's] burden to show prejudice." *Veal v. Cooper*, 936 F.Supp. 511, 514-15 (N.D. Ill. 1996) (citations omitted); *see also Dell v. Straub*, 194 F. Supp. 2d 629, 650 (E.D. Mich. 2002) (concluding that defense counsel's failure to present witnesses did not amount to ineffective assistance of counsel because the defendant failed to identify the witnesses, indicate their availability, or specify the content of their testimony).

Because the petitioner has not identified the substance of the testimony that would have been given by the various persons he identified as potential witnesses, he has not advanced any sufficiently grounded claim that his trial counsel was ineffective by failing to locate, interview, or call them to testify. *Charette v. Bell*, 106 F. App'x 327, 331 (6th Cir. 2004) ("Charette's claim that DuBusk failed to prepare adequately for trial, by failing to interview various, unnamed witnesses, suffers under the same defect as the argument above. . . . Although Charette asserts that there were witnesses who should have been interviewed by DeBusk, he does not point to any specific witnesses or what their testimony might have added to Charette's defense. Charette has also failed to provide the court with any argument regarding how this failure adversely affected his right to a fair trial. Because Charette has identified no witness who would have presented an alternative version of the events of December 25, 1987, or how this testimony would have affected the trial's outcome, there is simply no basis for concluding that DeBusk's failure to call other witnesses constitutes ineffective assistance to Charette."); *Moss v. Hofbauer*, 286 F.3d 851, 868-69 (6th Cir. 2002) ("The problem with Moss's argument . . . is that he does not identify any witnesses that his counsel should have called. . . . In addition, because Moss's allegations are conclusory, he is unable to show a reasonable probability that the result of his trial would have been different even if his counsel had performed in some other manner. We therefore conclude

that Moss failed to establish an ineffective-assistance-of-counsel claim based upon the contention that his counsel did not present a significant adversarial challenge.").

The petitioner also contends that his attorney failed to interview "tax preparers" who would have testified that he "did not prepare" the false tax returns that were presented by the petitioner to lending officials to substantiate inflated estimations of the borrowers' income and resources in order to procure loans. However, he has not identified how that information would have aided his defense, because, as the government points out, the petitioner was charged with presenting false documents to bank officials in order to procure loans, not preparing false tax returns. Moreover, Nazzal did not even identify by name any of the "tax preparers" that he believes should have been interviewed. He thus has failed to identify with any specificity the identity of the potential witnesses or the substance of any testimony favorable to the defense that could have been given by any particular witness who was not called at trial.

### ii. Failure to Call Petitioner to Testify and "Coercing" Him Not to Testify

The petitioner argues that his trial attorney was ineffective by failing to prepare him to testify in his own defense, and by "scaring" him into not testifying by advising him that if he took the stand he would "destroy" the defense of the case that his counsel had constructed. However, the petitioner's argument is belied by his own account of the testimony that he says he would have given, and he has not advanced any factual basis to suggest either that his counsel's strongly worded advice against taking the stand was unreasonable, or that he was prejudiced by not testifying. Any inference of prejudice as a result of allegedly deficient advice from counsel also is defeated by the trial record, which clearly indicates that the petitioner was aware that he had the right to testify and that the decision not to take the stand was his alone.

"The right of a defendant to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant." *United States v. Webber*,

208 F.3d 545, 550 (6th Cir. 2000). "The right to testify is personal to the defendant, may be relinquished only by the defendant, and the defendant's relinquishment of the right must be knowing and intentional. The defense counsel's role is to advise the defendant whether or not the defendant should take the stand, but it is for the defendant, ultimately, to decide." *Id.* at 550-51. "A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel." *Id.* at 551. "Counsel is also obliged to explain that the decision to testify or not belongs exclusively to the defendant. Importantly, however, no specific requirements govern the nature or content of those essential conversations between counsel and his or her client." *Smith v. Dickhaut*, 836 F.3d 97, 104 (1st Cir. 2016). "[I]f counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify. The defendant can then make the choice of whether to take the stand with the advice of competent counsel." *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992).

First, the advice by counsel that the petitioner should not take the stand, no matter how strongly worded, was not deficient. In fact, based on the petitioner's own account of his potential testimony, it would have been unreasonable for competent counsel to have advised his client otherwise. The petitioner described his potential testimony at trial as follows:

> Nazzal was denied a fair trial because the jury never got to hear from Nazzal concerning the real facts of how his financial business got started many years ago and how successful his business had been. Nazzal would have explained to the jury how even the government's own witnesses had been business partners for years in the financial lending business with no allegations of any illegal or fraudulent activities ever being raised by those business partners. Nazzal's testimony would have explained and clarified for the jury that many of the allegation[s] of criminal activities alleged by the government prosecutors were no more than business practices that were not illegal at all. If Mr. Fishman would have prepared Nazzal to testify and called Nazzal to testify Nazzal was prepared to truthfully bare his soul, his own life, his family life and his financial business practices and financial history

to the jury because Nazzal knew he was not guilty of various criminal charges for which he was being tried.

Def.'s Mot. at 13-14, ECF No. 263, PageID.4959-60. So far as that vague description goes, it reveals no potentially helpful or exculpatory information that the petitioner's testimony could have provided. Instead, it indicates that the petitioner's testimony would have, if anything, lightened the burden on the government by confessing his involvement in the fraudulent activities to which other witnesses had testified in great detail. The petitioner's account of his proposed testimony suggests that he intended to take the stand, admit to his crimes, and then assert that they were not crimes, because he and his co-conspirators had carried on their affairs for years without being caught, and their practices of presenting false financial documents, obtaining forged and notarized authorizations for loan transactions, and false swearing to cover up those misdeeds, all were regarded by them as "business as usual." No reasonable jury could have considered such testimony as weighing in favor of acquittal.

The trial record demonstrates that, rather than aiding the petitioner in further incriminating himself, his trial counsel made a reasonable strategic choice under the circumstances sternly to counsel the petitioner against testifying, and instead to focus the trial presentation on impeaching the government's star witnesses — the petitioner's co-conspirators — by highlighting their own complicity in the scheme, and their biases and incentives to testify adversely to the petitioner in order to cast blame on him and exculpate themselves. Nothing in the petitioner's account of his proposed testimony suggests that any advice by his counsel against taking the stand was anything other than reasonable and prudent under the circumstances; and the petitioner certainly has not advanced any sufficient factual basis to overcome the strong presumption that counsel's advice was within the wide range of sound counsel on trial strategy. *Gonzales v. Elo*, 233 F.3d 348, 357 (6th Cir. 2000) ("Whatever the reason given, the parties agree that defense counsel's decision to

advise Petitioner not to testify was a tactical one based on trial strategy. As such, Petitioner's assent is presumed as is the effectiveness of Petitioner's counsel, barring any indication by Petitioner at trial that he disagreed with his counsel."); *see also United States v. Teague*, 953 F.2d 1525, 1533 n.9 (11th Cir. 1992) ("There are good tactical reasons why it may not be best for the defendant to testify in some circumstances. *Some examples might be if the defendant might provide evidence of missing elements of the crime on cross-examination*, if the defendant might be prejudiced by revelation of prior convictions, or if the prosecutor might impeach the defendant using a prior inconsistent statement." (emphasis added)); *Starkweather v. Smith*, 574 F.3d 399, 403-04 (7th Cir. 2009) ("It is not hard to imagine why an attorney in Starkweather's counsel's position may have been inclined to [try to prevent his client from testifying]. Knowing that Starkweather wanted to testify that he shot his victims in self-defense and that he was not responsible for Demery's death, a reasonable attorney could have judged that the jury would be more likely to accept his testimony as proof of insanity than it would be to accept this testimony as proof of innocence."); *Bower v. Quarterman*, 497 F.3d 459, 474-75 (5th Cir. 2007) ("[B]y testifying that he was at the ranch on the day of the murders and had met with the victims, Bower would have established the time/proximity element of the state's case without gaining any benefit for his alternate theory that someone else committed the murders. Buckner's advice on testifying and his time/proximity strategy were not unreasonable, and we decline to find deficiency."); *Frey v. Schuetzle*, 151 F.3d 893, 899 (8th Cir. 1998) ("Counsel listed several strategic reasons for advising Frey to exercise his Fifth Amendment right not to testify. Frey's attorney testified that more evidence of Frey's drug and alcohol use would have been admitted and that, in his view, this would have hurt the chances for an acquittal. . . . Counsel advised Frey that he could argue to the jury that the state's circumstantial evidence was consistent with the self-defense theory without subjecting Frey to

damaging cross-examination. He summed up his advice by telling Frey that he thought they should 'quit while [they were] ahead.' Counsel's reasons for advising Frey not to testify show that the advice was reasonable trial strategy based on counsel's professional evaluation of the case.").

Second, nothing in the petitioner's terse allocution of his prospective testimony tends specifically to impeach any of the voluminous testimony and documentary evidence that was entered at trial that pointed overwhelmingly to his guilt. The petitioner instead merely speculates that if he had been allowed to tell "his side of the story," then the jury would have been sympathetically disposed to acquit him. Nothing in the petitioner's account of his prospective testimony therefore suggests that he was prejudiced when he was not called to testify at trial. *Hodge v. Haeberlin*, 579 F.3d 627, 640 (6th Cir. 2009) ("Hodge . . . fails to demonstrate prejudice. In his state-court post-conviction petition and in his brief to this court, Hodge gives no details about the substance of his testimony but speculates that it would have had an impact on the jury's view of Bartley's and Hamilton's credibility and of Hodge's involvement with the Morris murders."); *Gonzales*, 233 F.3d at 357 ("Petitioner has failed to show that he was actually prejudiced by his failure to testify. The record indicates that several witnesses corroborated the government's version of the events on the night in question, and in a case where Petitioner is claiming that his testimony would have been that [one of the government's witnesses] was not telling the truth, Petitioner has not shown actual prejudice."); *Smith v. Dickhaut*, 836 F.3d 97, 106-07 (1st Cir. 2016) (holding that the defendant's proposed testimony at trial was wildly implausible, and would have required the jury to disbelieve most or all of the other evidence and testimony offered, and that the defendant therefore had not shown that he was prejudiced when he was not called to testify); *Cannon v. Trammell*, 796 F.3d 1256, 1275 (10th Cir. 2015) ("Cannon would not have advanced his cause by testifying at trial. Nor do we find any error in the district court's

conclusion that Cannon was evasive on cross-examination. [Therefore], Cannon cannot show he was prejudiced by his failure to testify at trial.").

Third, the petitioner's claim that he was "coerced" by his trial counsel not to testify is unsupported by any factual basis, because by the petitioner's own account nothing in counsel's conduct was "coercive." Moreover, the petitioner fully was informed by the Court, on the record, that he had a right to testify, and that the decision whether to take the stand was his alone to make. He indicated on the record that he understood the right and voluntarily chose not to testify, and his depiction of the advice given by his counsel does not approach the sort of "coercive" conduct that has been found to overbear a petitioner's individual will in other cases.

Nothing in the petitioner's account of the interactions constitutes any suggestion of actual "coercion," despite the petitioner's repeated conclusory description of his attorney's conduct as "coercive" and "threatening." In his motion, the petitioner described the situation as follows:

> Mr. Fishman explained to Nazzal that if he took the stand and testified he would do exactly what the government prosecutors wanted him to do and they would use his testimony against him and he would lose the case. Mr. Fishman told Nazzal look we have the case won so don't screw this up by taking the stand and have the government discredit you in front of the jury. Mr. Fishman told Nazzal I am not going to allow you to testify and destroy the defense we have prepared. If you testify you will have no defense. . . . During Nazzal's trial when the trial judge inquired if Nazzal was going to testify Nazzal responded that he was not goin[g] to testify. Based on Mr. Fishman's [advice], warnings, and coercion Nazzal did not tell the trial judge that he wanted to testify so the jury could hear his side of the case and he had been advised and threatened by Mr. Fishman to tell the judge he did not want to testify. Nazzal was confused and did not know what action to take so he just followed Mr. Fishman's orders against his will and better judgment.

Def.'s Mot. at 13, ECF No. 263, PageID.4959. The petitioner conspicuously does not assert that his counsel did not inform him that he had a right to testify, or that he was not informed that the decision to testify was his alone, or that his counsel was in any way deceptive or threatened to take any extreme action such as withdrawing from the representation if the petitioner elected to take

the stand. And even if counsel had failed to inform him that he had a right to testify, the Court furnished that advice to him on the record, as discussed below.

Counsel's advice that the petitioner's proposed testimony would "destroy" any potential defense was both prescient and prudent under the circumstances, where the petitioner's description of "his side of the story" clearly would have eviscerated any potential for trial counsel to mount an effective attack on the credibility of the government's witnesses and the government's failure to satisfy the burden of proof. Nothing in the petitioner's account or the trial record suggests anything more than that the petitioner strongly was advised not to take the stand, and, probably wisely, chose to follow that advice. *Rogers-Bey v. Lane*, 896 F.2d 279, 283 (7th Cir. 1990) ("While the decision to testify is ultimately up to the individual defendant, it may be based on reasonable advice given by counsel. Rogers makes no allegation that the decision was not his alone, based on advice from counsel. He was not 'prevented' from testifying in any way by the court or by his counsel. Had he decided that he wished to testify, he could have. Instead, he claims he was unduly influenced by ineffective assistance of counsel. But as we have noted, counsel's advice was not inappropriate. We conclude that Rogers was not denied the right to testify on his own behalf."), *abrogated in part on other grounds by Willis v. Aiken*, 8 F.3d 556, 566 (7th Cir. 1993).

Moreover, any doubt about whether the petitioner freely elected not to exercise his right to testify in his behalf was eliminated by the colloquy on the record where the Court inquired about the petitioner's intention and he answered that he understood that he had the sole personal right to make the decision, and that he had decided not to exercise that right:

> THE COURT: Mr. Nazzal, the — your lawyers have rested your case without calling you as a witness or presenting any evidence. Do you understand that you have a right to testify if you want to testify in this case?
>
> DEFENDANT NAZZAL: Yes, your Honor. Yes.

THE COURT: And even though your attorneys have rested, if you choose to testify, we can reopen the case and have you testify. Do you understand that?

DEFENDANT NAZZAL: Yes, your Honor.

THE COURT: Have you had a chance to discuss your decision about whether to testify or not with your lawyers to your satisfaction?

DEFENDANT NAZZAL: Yes, your Honor, and I am satisfied.

THE COURT: All right. I just have a couple more questions. Do you understand that the decision about whether you should testify or not is not your attorney's decision, but it's yours and yours alone?

DEFENDANT NAZZAL: Completely understood.

THE COURT: All right. And is it your decision to remain silent and not testify in the case?

DEFENDANT NAZZAL: Yes, your Honor.

THE COURT: Do you have any questions about that?

DEFENDANT NAZZAL: Nothing, your Honor.

Trial Tr. Vol. XII at 221-22, ECF No. 243, PageID.4367-68.  That colloquy eliminates any doubt about whether the petitioner's election not to testify was made knowingly and voluntarily.  *Jordan v. Hargett*, 34 F.3d 310, 314-15 (5th Cir. 1994), *on reh'g en banc*, 53 F.3d 94 (5th Cir. 1995) ("The uncertainty in this area [is entirely avoided where the trial court] conduct[s] a colloquy and obtain[s], outside of the jury's hearing, a statement on the record from the non-testifying defendant that he is aware of his right to testify and has chosen voluntarily to waive that right."); *see also Logan v. United States*, 910 F.3d 864, 871 (6th Cir. 2018) ("[T]he fact that the defendant 'was ultimately responsible for deciding whether to testify himself or to call certain defense witnesses did not render him without the aid of counsel,' In other words, when a defendant receives the necessary information to make a call, the fact that the ultimate decision is left to him does not render counsel absent or ineffective." (quoting *Harrison v. Motley*, 478 F.3d 750, 756 (6th Cir. 2007))); *Nejad v. State of Georgia*, 830 F.3d 1280, 1295 (11th Cir. 2016) ("If the trial judge told

Nejad that 'the ultimate decision whether to testify was his alone, made after hearing the advice of his attorneys,' then Nejad knew he could testify, regardless of what his attorneys told him."); *Harrison*, 478 F.3d at 757 (6th Cir. 2007) ("The court found that Harrison was provided with advice from [his attorneys on the risks of taking the stand in his own defense] and that he made the decision himself not to testify. . . . Harrison, therefore, cannot claim that he was deprived of the opportunity to testify."); *United States v. Pungitore*, 965 F. Supp. 666, 673-74 (E.D. Pa. 1997), *aff'd*, 172 F.3d 861 (3d Cir. 1998) ("[A]ny claim that a defendant in the instant case was not permitted to take the stand by his attorney despite expressing a desire to do so is contrary to the trial record. At the close of the defense case, the jury was excused and attorney Simone, who was acting as lead counsel for the defendants, stood in front of the bench and asked the following of all the defendants at the request of the court: 'With that, your Honor, we would move into evidence the exhibits that have been marked during the government's case, as well as those few that have been marked during the defense case, and I believe, if anybody disagrees with me raise their hand, I believe all of the defendants would rest, is that correct?' [A]s the record reflects, there was no response from anybody. The meaning of the question was clear and any defendant who wanted to testify could have so indicated at that time. As such, [the claim that the defendant was prevented from testifying] is completely without merit.").

iii. Failure to Move for Severance or to Call Co-Defendant Schneider to Testify

The petitioner's argument that his trial counsel was ineffective by failing to move for a severance so that his co-defendant Edward Schneider could be called to testify for the defense is without merit, because the petitioner has not identified the substance of any proposed testimony by Schneider that would have aided the defense, and trial counsel was not obligated in any event to make a motion for severance that would not have been granted.

The petitioner attached to his motion an affidavit from Schneider in which he asserts that, if the trial had been severed, he would have been willing to testify for the defense in Nazzal's trial. However, with respect to this proposed testimony, Schneider stated only that: "The thrust of my testimony would have been that I had provided legal services to Mr. Nazzal for the past 10-11 years and that I had given legal advice to Mr. Nazzal that was directly related to some of the factual allegations alleged by the Government in [the case] for which we were standing trial." Edward Schneider aff. ¶ 4, ECF No. 263, PageID.4984. Nothing in that terse and vague summary suggests that anything Schneider had to say would have been helpful to the defense, or would have impeached any of the other evidence suggesting that Schneider's "legal services" frequently were employed by Nazzal in the course of the fraud scheme. Schneider's proposed testimony would have provided little more than an admission of complicity in the criminal activities about which an overwhelming volume of other evidence was offered at trial. As the Court observed at the sentencing hearing, the record amply demonstrated Schneider's role as an enabler of the fraud enterprise, and his proposed testimony would not have contradicted any of the conclusions about the petioner's culpability that were reached by both the Court and the jury:

> Once again, the Court has reviewed the testimony again, and through my notes, in any event, and sat through the trial in the case. The evidence made clear to me that Mr. Schneider used his expertise as a lawyer to participate in enabling Mr. Nazzal to engage in the fraudulent conduct for which he was convicted.

> Mr. Schneider's role in the case certainly was not as extensive as Mr. Nazzal, consequently, even though there is a significant amount of loss attributable to his conduct, there is some measure of mitigation for a number of reasons: One, that the loss amount incurred by the institutional parties in the case, the banks, certainly would not have been as great as it was had sensible bank practices been followed.

> Secondly, Mr. Schneider was somewhat of a pawn working at the behest of Mr. Nazzal. Mr. Schneider does not appear to have personally profited from the conduct that he engaged in and that Mr. Nazzal organized.

Sentencing Tr. at 87, ECF No. 247, PageID.4670.

Moreover, even if anything in Schneider's testimony could have been helpful to Nazzal's defense, it is well settled that defendants "are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *United States v. Long*, 190 F.3d 471, 476 (6th Cir. 1999). Thus, a motion for severance on the sole basis of a desire to call Schneider to the stand would not have been granted, and counsel cannot be faulted for failing to pursue a groundless motion. *Jalowiec*, 657 F.3d at 321-22; *Knowles*, 556 U.S. at 123.

### iv. Failure to Present a Defense

The petitioner also argues, in a conclusory fashion, that his trial lawyer was "entirely unprepared for trial," "failed to present any evidence," and simply "did nothing" at trial rather than discharging his duty to subject the prosecution's case to robust adversarial testing. That undeveloped and unsupported position is belied by the trial record, which amply reflects trial counsel's determined advocacy. The apparent absence of any actual evidence that could have seriously contradicted the proofs presented by the government bolsters the conclusion that the record demonstrates that counsel made an able and appropriate effort to impeach the government's case through thoughtful and well-prepared opening and closing statements, and via searching cross examination of all the government's witnesses. *See* Trial Tr. Master Index, ECF No. 246. Counsel also filed and argued a pretrial motion to exclude significant items of evidence offered by the government and made a mid-trial motion for a judgment of acquittal on one count. Counsel also repeatedly objected to questions and evidence offered by government counsel at trial. The record does not support the petitioner's claim that his counsel was "entirely unprepared" or made "no effort" to defend his case, and he has not pointed to any other evidence to support that claim. *United States v. Roy*, 855 F.3d 1133, 1184 (11th Cir. 2018) ("[Defendant's attorney] tenaciously defend[ed] Roy in his opening statement, throughout the trial, and in his closing argument. [He] cross-examine[d] nine government witnesses, including the one who was on the stand when he

returned to the courtroom . . . . object[ed] to questions asked by the prosecutor and ma[de] a vigorous closing argument. Throughout the trial, the jury saw and heard counsel, in *Cronic* terms, 'subject the prosecution's case to meaningful adversarial testing.'" (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984))); *Castillo v. Florida*, 722 F.3d 1281, 1287 (11th Cir. 2013) ("[C]ounsel did not entirely fail to subject the prosecution's case to meaningful adversarial testing. To the contrary, he consistently opposed the prosecution's case. He filed a pretrial motion to suppress Castillo's confession. He questioned the venire members. He successfully challenged several prospective jurors for cause. He used peremptory challenges to remove another three potential jurors. He gave an opening statement. He made numerous objections. He moved for a mistrial on several occasions on different grounds. He cross-examined each of the State's witnesses. And he gave a closing argument urging the jury to acquit. His strategy was to pursue a defense of mistaken identity, and he pursued it the best he could with what he had to work with. Counsel did subject the prosecution's case to meaningful adversarial testing, not just on occasion but throughout the trial."); *Hooks v. Workman*, 689 F.3d 1148, 1186 (10th Cir. 2012) ("The record reveals a vigorous adversarial trial, with numerous objections by Mr. Hooks's counsel, poignant cross-examination of the State's witnesses, several side bars with the court to advance Mr. Hooks's cause, and a competent closing argument.").

The petitioner's third claim that his trial counsel was ineffective by failing to mount a more effective defense is without merit.

### B. Judgment of Restitution

In a supplemental brief, the petitioner proposed to add a "fourth ground for relief" to his motion, in which he argues that the banks involved in the case did not qualify as "victims" under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, because the loans that they issued were "phoney," and they "ignored" signs that the borrowers had no means to repay them. The

government contends that the claim is untimely because the "supplement" was filed long after the one-year limitations period had expired, *see* 28 U.S.C. § 2255(f), and it also was procedurally defaulted because the petitioner attacked the restitution award in his direct appeal and failed to raise the victim-status argument there. The petitioner, in a reply in support of the supplement, belatedly attempted to recast this "fourth ground" as merely another example of the ineffectiveness of his trial counsel, by arguing that counsel's performance was deficient when no victim-status objection was raised during the sentencing phase of the case. In any event, the Court is not required to address issues relating to pleading deficiencies or procedural hurdles before evaluating the merits of the claim. *See Johnson v. United States*, 735 F. App'x 1007, 1010 (11th Cir. 2018) ("The government contends [that the petitioner] procedurally defaulted on his *Johnson* claim because he failed to raise it in his direct appeal. We decline to address the procedural default issue because his *Johnson* claim loses on the merits in any case.").

The petitioner's argument is without merit because he has not pointed to any factual basis to sustain his contention that any responsible employees of the banks — other than Fifth/Third's loan officer, Eric Morton, who was the petitioner's co-conspirator — engaged in any conduct that rendered them in any way "complicit" in the fraud scheme. The record evidence points decidedly to the contrary, where it amply demonstrated that the loan approvals were procured by elaborate artifices orchestrated by the petitioner and expressly designed to deceive the institutions about the financial means of the borrowers, and which in some cases went so far as involving forgery of loan approvals by unwitting supervisors in Morton's chain of command, for loans that manifestly would not have been approved. Even if there were some extant information in the record suggesting that bank officials other than Morton were less than diligent, that does not suffice to demonstrate that the institutions did not qualify as victims due to their complicity in the crime. *United States v.*

*Ganz*, 90 F. Supp. 3d 388, 391 (E.D. Pa. 2015) ("Defendant describes general lending practices used at the height of the subprime mortgage market, but, without more, this does not support a conclusion that either Wells Fargo or Chase was complicit in the particular transactions of Defendant's fraudulent mortgage scheme. Courts have acknowledged that lending policies and procedures may have encouraged fraud, but this does not prevent banks from also being victims of such fraud.") (collecting cases).

The lone case cited by the petitioner in support of his fourth claim is readily distinguishable, because there the court of appeals found that it was undisputed that the "victim" bank made virtually no inquiry into the financial wherewithal of borrowers who applied in rapid-fire fashion for home mortgages in outrageous amounts, based on "transparently" false applications that the sentencing court described as "jokes on their face." *United States v. Litos*, 847 F.3d 906, 909 (7th Cir. 2017) ("We are mindful that the federal criminal code requires 'mandatory restitution to victims of certain crimes,' 18 U.S.C. § 3663A (the Mandatory Victim Restitution Act of 1996, usually referred to as the MVRA), including fraud, see § 3663A(c)(1)(A)(ii), but only for 'an offense resulting in damage to or loss or destruction of property of a victim of the offense.' § 3663A(b)(1). That doesn't seem to describe the loss suffered by Bank of America as a result of its improvident loans, especially when we consider its complicity in the loss — its reckless decision to make the loans without verifying the solvency of the would-be borrowers, despite the palpable risk involved in, for example, providing mortgage loans to a person who applies for six mortgages in ten days."). Any similar inference of complicity sharply is undercut in this case by the trial testimony — and the petitioner's own recitation of the record evidence in his supplemental brief — which highlighted the lengths to which the petitioner went to present false records substantiating the financial situation of the borrowers for whom he brokered loans. That such

artifices were necessary to consummate the fraud suggests that significant assurances of the borrowers' financial viability were in fact demanded by the lenders, and the petitioner has not pointed to any information suggesting otherwise.

Whether or not the fourth claim was procedurally defaulted, it is devoid of any factual basis and without merit, because counsel was under no obligation to raise the frivolous objection to the restitution award that the petitioner now urges on the Court.

## III. Conclusion

The petitioner has not put forth any sufficient facts or legal argument to suggest that his trial counsel was ineffective in any of the various instances cited in his motion, and the record of the proceedings in the case conclusively shows that his attorneys effectively and ably advocated his defense. The petitioner therefore has not established that he is entitled to relief from his conviction or sentence.

Accordingly, it is **ORDERED** that the petitioner's motion to supplement the petition (ECF No. 269) is **GRANTED**.

It is further **ORDERED** that the petitioner's motion to vacate his sentence (ECF No. 263) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   September 26, 2019

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on September 26, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI

---