**UNITED STATES OF AMERICA**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,
      Plaintiff,

                               Case No. 10-20392

V.

                               Hon: DAVID M. LAWSON

HUSSEIN NAZZAL,
      Defendant.
_____/

**DEFENDANT'S EMERGENY MOTION**
**FOR REDUCTION IN SENTENCE**
<u>**(COMPASSIONATE RELEASE)**</u>

<u>**Introduction**</u>

Hussein Nazzal, through his counsel, Mark A. Satawa, respectfully moves this Honorable Court, pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A)(I), to reduce the remainder of Mr. Nazzal's 110 month term of imprisonment to time served, and to impose a special condition that he serve a period of home confinement on supervised release.

Such a modification will effectively allow him to finish the remaining portion of his prison sentence on home confinement, which will in turn allow him to protect himself, the BOP, and the community from the spread of the novel coronavirus 2019 ("COVID-19") by sheltering in place at his residence in light of his serious underlying and pre-existing medical conditions. These conditions include, but are not limited to, his age (65), diabetes, cardiovascular risks (he underwent cardiac catheterization before incarceration, severe

asthma, benign hypertrophy of prostate, and high blood pressure.  In combination these place Mr. Nazzal in the COVID-19 highest-risk category.

## Case Background

On March 7, 2013, Mr. Nazzal went to trial in the Present Case, docket no. 10-cr-20392. On March 26, 2013, he was convicted by a jury.

Then, on July 16, 2013, Mr. Nazzal pleaded guilty in a second case to one count of conspiracy to defraud the United States pursuant to a Rule 11 plea agreement before the Honorable Marianne Battani, in case number 11-cr-20759, involving immigration law violations. On October 31, 2013, he was sentenced to a term of 33 months in the BOP.

Following that sentence, on December 2, 2013, Mr. Nazzal was sentenced to a term of 110 months in the Present Case, 10-cr-20392. That sentence was to run concurrently with the 33 month sentence above-referenced matter, and included a $600 special assessment and $2,981,246.31 in restitution. Mr., Nazzal paid his special assessment and approximately 2/3's of the restitution before beginning service of this sentence. Upon information and belief, Mr. Nazzal self surrendered at FCI Milan, and began his sentence on or about February 13, 2014.

Mr. Nazzal has completed his sentence in the immigration case, and is now only serving the sentence for the Present Case. He has served approximately 75 months of that sentence, and his out date is currently November 27, 2021.[1]

## Argument

I.   **Mr. Nazzal has satisfied the 30-Day Waiting Period Provided by 18 U.S.C. § 3582(c)(1)(A).**

Title 18 U.S.C. §3582 states that the administrative procedure for requesting a compassionate release is through the warden of the BOP facility where the inmate is located. Mr. Nazzal made his request to the Warden for a Reduction of Sentence ("RIS"),[2] filed by an attorney on his behalf, on May 6, 2020.[3]  Upon information and belief, the BOP denied his RIS on May 18, 2020. This Motion is timely as being filed 30 days after Mr. Nazzal filed his RIS. *See United States v. Miamen*, 2020 WL 1904490 at *3 (D.R.I. Apr. 17, 2020) (holding that "If the BOP denies Defendant's request, or thirty days lapse, whichever occurs first,  Defendant is free to file again his Motion before this Court."); *United States v. Jemal*,

---

[1] https://www.bop.gov/inmateloc/

[2] The request is attached to the Appendix of this Motion.

[3] The BOP's email acknowledgment of receiving this request, dated May 6, 2020, is attached to the Appendix of this Motion

15-cr-570 (E.D. Pa.); *United States v. Guzman Soto*, 2020 WL 1905323 *4 (D. Mass. Apr. 17, 2020) (Talwani, J).

The First Step Act provides that the defendant has the authority to make this motion to the warden of defendant's facility, and the warden has the authority to make this recommendation to the central office who forwards this to the sentencing judge for action. Mr. Nazzal's immediate concern is that he has several serious medical conditions that put him in the highest of high risk categories as it relates to Covid-19: diabetes, cardiovascular risks, severe asthma, prostate issues, and high blood pressure.

## II.    This Honorable Court Should Act Immediately to Grant Mr. Nazzal Compassionate Release.

Congress did not define what would constitute an "extraordinary and compelling reason" warranting a reduction of a sentence under § 3582(c). Indeed, the legislative history confirms that it intended to grant federal sentencing courts broad discretion to make those determinations on a case-by-case basis and to reduce fundamentally unfair sentences where such reasons exist.

Over the past few months, COVID-19 has spread throughout the United States, infecting thousands of Americans and inflicting many with severe respiratory illness;

thousands of Americans have perished.[4] On March 11, 2020, the World Health Organization described the COVID-19 outbreak as a global pandemic. COVID-19 poses a fatal risk to people 60 years of age and older and those with preexisting conditions.[5]

The First Step Act benefits the elderly, who have served over half their sentence, and who suffer from chronic health concerns. Mr. Saad appears to fit this criteria. He suffers from chronic or serious medical problems, including diabetes, cardiovascular risks (he underwent cardiac catheterization before incarceration), severe asthma, benign hypertrophy of prostate, and high blood pressure.[6] This combination of medical issues puts Mr. Nazzal is the highest possible high-risk category for contracting a severe case of Coronavirus.[7] ***Every one*** of these were diagnosed prior to sentencing and his admission into the BOP, and were verified and reflected in his Presentence Report ("PSR").[8] Mr. Nazzal has suffered from most of

---

[4] *See* generally CDC: COVID-19 Situation Summary, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html

[5] *See* Centers of Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19) Are You at High Risk for Severe Illness? (March 12,2020), https://bit.ly/2vgUt1P; World Health Organization, Q&A on coronaviruses (COVID 19), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (those at greater risk from COVID-19 include "older persons and persons with pre-existing medical conditions (such as high blood pressure, heart disease, lung disease, cancer or diabetes)" (March 9, 2020)).

[6] Mr. Nazzal's BOP medical records are attached as the Appendix to this Motion.

[7] *See* CDC guidance at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[8] *See* PSR, ¶'s 51 – 53, 88, pp 13, 20.

these problems for quite some time, prior to his incarceration, and was brought to the Court's attention at the time of sentencing. In fact, his medical condition was noted as a 3553(a) factor and potential issue in the PSR if he was "sentenced to a custodial sentence."[9] Even the Government has acknowledged that Mr. Nazzal has been housed in the specific unit designated for inmates "potentially at risk for COVID-19," since mid-April.[10]

In order to treat these conditions, Mr. Nazzal takes 11 different types of medication, which include:[11]

1) metformin 1000 mg 2x daily to treat diabetes;

2) glipizide 5 mg 2x daily to treat diabetes;

3) carvedilol 325mg 2x daily to treat the cardiovascular condition;

4) aspirin 80mg 2x daily to treat the cardiovascular condition;

5) doxazosin 8 mg and Flomax for benign prostate cancer;

5) meclizine 25 mg 3 times daily for chronic vertigo;

6) parastatin and triglyceride 40 mg for high cholesterol;

7) duloxetine 60 mg for nerve damage caused by diabetes;

8) albuterol and Symbicort for chronic asthma;

9) fluticasone 50 mg for chronic sinusitis;

10) acetaminophen and naproxen for chronic pain;

11) Prilosec for abdominal pain.

---

[9] PSR, ¶ 88, p 20.

[10] Government Response, ECF #285, p 3.

[11] *See* Mr. Nazzal's BOP medical records are attached as the Appendix to this Motion.

Finally, Mr. Nazzal has served 75 months of his 110 month sentence. His out date is November 27, 2021, or approximately 18 months from now. This medically at risk inmate has been exposed to the novel coronavirus at FCI Milan.  Mr. Nazzal is in the highest risk category of individuals who face grave health consequences or death from exposure to COVID-19.

 Mr. Nazzal' medical condition, combined with the short amount of his time remaining on his sentence, and the high risk posed by COVID-19 (to which he has been exposed in Milan), clears the high bar set by 3582(c)(1)(A). As discussed in the recent opinion and order in *United States v Wilson Perez*,[12] U.S.S.G. 1B1.13 n.1(D) defined two reasons for release: (1) "extraordinary and compelling circumstances exist where the defendant  is suffering from serious physical or medical condition….that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover"; (2) 1B1.13, n.1(D) authorizes release based on "extraordinary and compelling reasons other than, or in combination with, the [other] reasons described."

The Court in *Perez* found that the seriousness of the disease coupled with the inmate's inability to distance himself from others and to protect himself in his close-quarters confinement from other inmates and staff who could be infected with COVID-19, were facts relevant to consider in evaluating whether or not the inmate was a serious candidate for release under the First Step Act.

---

[12] *United States v Wilson Perez*, Case No. 17 Cr. 513-3 (AT), Southern District of New York, Judge Analisa Torres, April 1, 2020.

In *United States v. Saad*, No. 16-20197, (E.D. Mich April 29, 2020), Judge Denise

Paige Hood ordered a 71 year old man released under the First Step Act, writing:

> The threat posed by COVID-19, in light of Defendant's age and his underlying health conditions, constitutes an "extraordinary and compelling reason" to modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(I). As stated by the *Zukerman* court, "[t]he severity of [Defendant]'s conduct remains unchanged. What has changed, however, is the environment where [Defendant] is serving his sentence. When the Court sentenced [Defendant], the Court did not intend for that sentence to 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic." *Zukerman*, 2020 WL 1659880, at *6 (citing *United States v. Rodriguez*, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020)).

> The United States Sentencing Commission has defined "extraordinary and compelling reasons." *See* U.S.S.G. § 1B1.13, comment n.1. There are extraordinary and compelling reasons for modification where "[t]he defendant is ... suffering from a serious physical or medical condition ... that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 comment n.1(A)(ii).

*     *     *

> As the World Health Organization has determined, the populations most at risk of suffering severe health risks from COVID-19 are "older people, and those with underlying medical problems like cardiovascular disease [and] cancer." Coronavirus, World Health Organization (Apr. 27, 2020), https://www.who.int/health-topics/ coronavirus#tab=tab_1. According to the United States Center for Disease Control, persons over the age of 65 and individuals of any age who have serious underlying medical conditions, [as noted above], are at higher risk for severe illness from COVID-19. People Who Are at Higher Risk for Severe Illness, Centers for Disease Control and Prevention (April 27, 2020), https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/people-at-higher-risk.

> Defendant is among those persons most at risk. Data released by the CDC indicates that approximately 80% of deaths from COVID-19 in the United States occur in individuals age 65 or older and that the fatality rate for individuals aged

65 to 84 could be as high as 11 percent. Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12 – March 16, 2020, Centers for Disease Control and Prevention (Mar. 26, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm. As an inmate at FCI Milan, [Defendant] has already been exposed to COVID-19.

*U.S. v. Saad*, *supra*, pp 12-15.[13]

## IV.   A reduction in sentence is warranted considering the other sentencing factors.

In determining whether Mr. Nazzal' sentence should be reduced, the court must decide, *inter alia*, whether he presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g) and USSG §1B1.13(2). If he does not, the court should then look to the factors outlined in 18 U.S.C. §3553(a). All these factors weigh strongly in favor of release in his Case.

Mr. Nazzal, aged 65, was convicted of a nonviolent offense, that involved defrauding banks.  He has served the majority of his sentence, and has an out date in 18 months. Importantly, he paid nearly approximately 2/3's of the $2,981,246.31 in restitution before he self surrendered to begin his sentence. He has no other criminal record, and his criminal history score at sentencing was 0. His only previous criminal contact before these two federal offenses was a minor theft offense in a casino in Canada, in which he received a pardon.

---

[13] *See also, United States v. Demetrious Flenory*, No. 05-80955, 2020 WL 2124618, at *4-5 (E.D. Mich. May 5, 2020); *Unites States v Collins*, No. 17-20360 (E.D. Mich May 7, 2020) (J. Lawson). *United States v. Doshi*, No. 13-20349, (E.D. Mich March 31, 2020) (J. Tarnow).

He has very strong family support, respect in the community and his peers, and a strong employment record throughout his life. He does not present a danger to the safety of any person or the community. The punishment he has already served in prison (75 months) is sufficient to deter any potential perpetrator of bank fraud. Release of an elderly and frail man during the peak of global epidemic will not encourage future bank frauds from taking place.

Mr. Nazzal has demonstrated exemplary behavior during his incarceration The Government has cited to a single incident of misconduct that occurred four and a half years ago as evidence of his conduct in prison.  This incident was a minor argument in a ceramic class, that was quickly resolved. Attached to this Motion is a copy of one page of a letter that Mr. Nazzal's Unit team submitted to this case manager regarding the incident, stating that Mr. Nazzal is "respectful" and "harmless."[14] Mr. Nazzal did not lose any good time credit in connection with this "misconduct.".

The Government has also cited *allegations* related to Z.C. and H.M. in the immigration fraud matter, case number 11-cr-20759, before the Honorable Marianne Battani. Upon information and belief, these allegations were included at the very last moments of his sentencing in that case. The inclusion of these claims demonstrate the danger of relying upon

---

[14] Mr. Page 2 of this letter from his Unit Team is attached as the Appendix to this Motion. Counsel is attempting to secure the rest of the letter, and will submit it to this Court immediately upon receipt.

such unchallenged claims that have not been vetted by the adversarial process, including cross examination.

At the onset it should be noted that Mr. Nazzal has completed his sentence in the companion case wherein restitution was awarded to Z.C. and H.M. Furthermore Mr. Nazzal did not admit to the allegations of abuse, and Z.C. and H.M. had a motive to testify against Mr. Nazzal as Z.C. illegally acquired United States citizenship and was facing possible deportation.

At the plea hearing on July 16 2013, Mr. Nazzal admitted to knowingly arranging false marriages. However, he did not admit to the allegations of abuse regarding Z.C. and H.M. In addition to Mr. Nazzal's counsel submitting numerous objections to the Presentence Report ("PSR"), his counsel also attempted to offer expert witness testimony and prior inconsistent statements of Z.C. to rebut her allegations. However, Judge Battani rejected their admission. Even the Court of Appeals recognized that "Mr. Nazzal did not admit these facts as part of his plea," when it denied his appeal. *United States v Mr. Nazzal*, 644 Fed Appx 655, 657 (CA 6, 2016).

Z.C. obtained a green card by fraudulently marrying a United States citizen, illegally acquired United States citizenship, and was facing possible deportation. However, because she testified against Mr. Nazzal, she was able to secure legal immigration status in the United States for herself and family.

**V.    Compassionate release is warranted given the current state of the health crisis in the prison environment.**

In opposing this Motion, and other similar motions in this District, the Government will likely argue that the BOP is doing great work to ensure the health and safety of Mr. Nazzal, who is being protected by a new shelter-in-place protocol to decrease the spread of the virus. However, that is simply an inaccurate picture, as despite their genuine and sincere efforts, the BOP is unable to insure the health and well being of Mr. Nazzal. While the curve appears to be flattening, and states reopening, the situation inside BOP prisons continues to deteriorate.

First, and importantly, apparently the correction officers who work at the Government's own facilities disagree that the BOP can protect Mr. Nazzal.  On March 31, 2020, the Council President of the correctional officers union filed a complaint to OSHA (Occupational Safety and Hazard Administration) alleging violations of OSHA elevating the complaint to one of "Imminent Danger Report."[15] In the complaint it is alleged that the BOP guidelines imposed by Federal Bureau of Prisons Assistant Director of Health Services and Captain Sylvie Cohen, M.D., Branch Chief for Occupational Safety and Health, directed staff throughout the BOP who have come into contact with or have been in close proximity with individuals who show or have shown symptoms of COVID-19, ***to report to work and not be self-quarantined and***

---

[15] Pursuant to OSHA of 1970, Executive Order 12196, 29 CFR 1960.8, Agency's Responsibilities, BOP Program Statement 1600.011, signed by Shane Fausey, Council President.

**not be quarantined for 14 days, per CDC guidelines**. (Emphasis added).  The complaint[16] states in detail the violations by the BOP, ordering staff back to work, the transporting of sick inmates, the BOP failure to mitigate or prevent exposure to the virus, mandating sick or potentially sick BOP employees to report to work.[17] This places not only staff in danger, but also inmates at extreme risk of contracting the disease, as they are not provided with protective gear, hand sanitizer (as are staff) and who are not able to social distance.

Health professional throughout the country are warning that despite the efforts of the BOP it is difficult, if not impossible, to safely address the spread of Covid-19 in prisons. For example, in the case of *United States v. Arguijo*, 20-50080, United States Court of Appeals for the Ninth Circuit, an *Amicus brief* was filed by a team of medical, public health, and human rights experts in support of the release of inmates due to COVID-19.[18] The Amici Curiae are experts in infectious diseases, healthcare policy, correctional healthcare, human rights and other related fields, who have spent decades studying the provision of healthcare in correctional facilities. Based on their experience, and their review of available information on the COVID-19 pandemic, it is their view that subjecting anyone to short-term confinement in

---

[16] The complaint is attached to the Appendix of this Response.

[17] *See* attached complaint for details.

[18] The *Amicus brief* is attached to the Appendix of this Response.

a jail subjects them and the broader community to a heightened risk of infection, hospitalization and death.

Dr. Scott Allen is a medical doctor with over two decades of experience in correctional health.[19] He is a Professor Emeritus of Medicine, former Associate Dean of Academic Affairs, and former Chair of the Department of Medicine at the University of California Riverside School of Medicine. In his written statement before the Senate Committee on the Judiciary on June 2, 2020,[20] Dr. Allen warned that "If you are not careful, detention and correctional

---

[19] Dr. Allen summarized his credentials as follows:

"I am a medical doctor with over two decades of experience in correctional health. I am a Professor Emeritus of Medicine, former Associate Dean of Academic Affairs, and former Chair of the Department of Medicine at the University of California Riverside School of Medicine. In the past, I have served for seven years as a full-time physician for the Rhode Island Department of Corrections; and, for the final three of those years, I served as the State Medical Program Director. I have published over 25 peer-reviewed papers in academic journals related to prison health care and am a former Associate Editor of the International Journal of Prisoner Health Care. I have consulted on detention health issues both domestically and internationally for the Open Society Institute and the International Committee of the Red Cross, among others. I have worked with the Institute of Medicine on several workshops related to detainee healthcare and serve as a medical advisor to Physicians for Human Rights. I am the co-founder and co-director of the Center for Prisoner Health and Human Rights at Brown University, and a former CoInvestigator of the University of California Criminal Justice and Health Consortium. Currently, I serve as the court appointed monitor for Riverside County Jails, my home county, and as a medical subject matter expert for the Office of Civil Rights and Civil Liberties in the Department of Homeland Security, where I have inspected multiple immigration facilities across the country over the past 6 years."

[20] Written Statement of Dr. Scott Allen, Examining Best Practices for Incarceration and Detention During COVID-19, before the Senate Committee on the Judiciary (June 2, 2020), attached as the Appendix to this Motion.

facilities can be a hub of spread of the virus throughout the community."[21] As to the idea of

the curve flattening, and conditions improving, Dr. Allen explained:

> Now the flames are growing. Indeed, recent data from the COVID Prison
> Project shows that prison populations test substantially higher than the
> general population in many states. Similarly, a new study in the Journal of
> Urban Health shows that optimistically, 72% of individuals in ICE detention
> are expected to be infected by day 90, with nearly 100% infected under more
> pessimistic conditions. . . . [22]

When it comes to claims by Prison Officials that they are employing herculean efforts

to prevent an out break, Dr. Allen responded:

> We will hear a lot today about the extraordinary efforts my colleagues have
> gone to confront this virus, mobilizing the traditional infectious disease
> containment strategies endorsed by the CDC in their March 23, 2020 Interim
> COVID guidelines for correctional facilities. But there are gaping holes in
> those guidelines, including failure to contemplate population reduction and
> failure to provide adequate guidelines for testing. The fact is, in the real
> world, the guidelines— and accordingly their implementation by BOP and
> ICE—are failing to stop the spread. The number of cases and deaths
> continues to grow. Even though many facilities can report that they have not
> yet experienced significant outbreaks, it is far too soon for anyone to declare
> victory.[23]

Importantly for Mr. Nazzal, Dr. Allen observes that "[i]t is also important to note that

even in the best circumstances, the provision of medical care in correctional and detention

---

[21] *Id*. at p 2 of 10.

[22] *Id*.

[23] *Id*. at p 4 of 10.

facilities is unfortunately inconsistent and inadequate."[24] Part of the solution is the

compassionate release of at risk inmates:

> The second strategy to reduce the spread of COVID-19 in detention,
> population reduction, is understandably controversial when first considered.
> But it is simply a matter of science: the biology of the virus plus physics and
> geometry driving its spread makes this a necessary strategy to consider.
> Jails, prisons, and detention centers at, near, or above capacity simply do
> not have the flexibility to move, cohort, and isolate individuals in the face of
> an outbreak. Populations must drop to create space for distancing and
> separation.

*      *      *

> All we are recommending is that the risk analysis of keeping people confined
> respects the need to reduce facility populations in order to permit the
> necessary isolation, quarantine and cohorting strategies required to contain
> the virus.

*      *      *

> ***In addition, the use of existing compassionate release mechanisms
> should be expanded for those individuals most vulnerable to severe
> COVID-19, including the elderly and those with certain high-risk
> chronic conditions***. One of the most common arguments against releasing
> incarcerated or detained individuals is that doing so could threaten public
> safety. But in this case, ***not releasing individuals may give rise to a more
> significant threat to public safety***. This is because of the heightened risk
> of the disease's spread from frequent ingress and egress of workers and
> detainees and the predicted overrun of local public health facilities.[25]

---

[24] *Id.*

[25] *Id.* at pp 6 of 10 to 7 of 10.

FCI Milan has reported a large number of COVID-19 cases, and Mr. Nazzal is in danger due to his health issues.  He meets the CDC standard of a vulnerable person who, if he contracts this deadly virus, there is a good chance that he would perish. According to BOP data, as of April 21, 2020 there were 39 inmates and 42 staff at FCI Milan that have been diagnosed with COVID-19.[26] By June 4, those number have raised to 71 inmates and 57 staff that have tested positive, along with 3 inmate deaths.[27]  Importantly, on March 30, the first date data from the BOP is available, there were no positive tests for either inmates or staff. The increase by the week over the course of two months is simply stunning.

All of these numbers only reflect the staff and inmates who were tested. Recently, the Associated Press and the Washington Post wrote that of 2700 inmates tested in the BOP, 2000 of them tested positive, thereby estimating that the BOP has a 70% infected rate amongst inmates.[28] It is well established that tests are limited, that COVID-19 is carried and passed on by those who show no symptoms at all, and that most of those who are symptomatic are not being tested.

This pandemic is far from over. It ignores the obvious fact that Michigan has only recently began to be lifted out of rigorous shelter at home orders issued by the Governor. The

---

[26] BOP data as of April 21, 2020 is attached to the Appendix of this Response.

[27] https://www.bop.gov/coronavirus/

[28] https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f

number of Coronavirus cases continue to rise at FCI Milan.[29] FCI Milan currently has nine open cases of coronavirus, five inmates and four staff members. Upon information and belief, over the course of the past few months, at least three of the infected inmates were housed in Unit C, where Mr. Nazzal is located.

Dr. Anthony Fauci, a member of White House Coronavirus Task Force, has warned of a possible comeback for the virus this upcoming fall, and that "he expects cases to spike in closed environments like nursing homes, prisons and factories."[30]

A Correctional Officer at FCI Milan, Randy Hall, would dispute the Government's claim that the BOP is taking appropriate measures to protect its inmates:

> It was possible he had contracted the virus even though he had none of the usual symptoms, like a fever or shortness of breath………
>
> If he had it, he didn't want to endanger his colleagues and inmates, so he called his office and asked to be tested. The request was denied. The Bureau of Prisons only tested inmates, not staff. They also didn't recognize his symptom as a COVID-19 symptom. They wanted him to keep coming to work even though *they didn't give him or his colleagues any personal protective equipment*…..
>
> When he called his office to report the result [positive for corona], though, they didn't seem to worry about the virus. They told him to return to work if he was fever-free for 72 hours, which he was because he never had a fever. Then they told him to return to work seven days after he started feeling the

---

[29] The BOP updates the open COVID-19 data daily at 3:00 p.m. The positive test numbers are based on the most recently available confirmed lab results involving open cases from across the agency as reported by the BOP.  https://www.bop.gov/coronavirus/

[30] *https://www.nytimes.com/2020/05/11/health/coronavirus-second-wave-infections.html*

symptoms, which was two days prior. Then they told him to return to work if there was any improvement at all.[31]

Upon information and belief, on April 1, 2020, FCI Milan was placed on a lockdown shelter-in-place for 14 days. That lockdown has been extended a few times, although the current status of that is not known.   Mr. Nazzal is currently housed in Unit C, with a cellmate. Unit C holds approximately 50 inmates, in 2-man bunk bed cells, and is currently being used to house all "high-risk" inmates. There are approximately 45 "high risk" inmates.

Social distancing and protective measures are nearly impossible.   All inmates are exposed to the same officers and staff members, are using the same bathroom facilities, and are eating the same food. Finally, FCI Milan is not providing sufficient personal protective equipment. They have given each inmate one mask that they must reuse, and the majority of the officers and staff members are not wearing protective gear.

**VI. Residence if transferred to Supervised Release**.

If this request for compassionate release/RIS is granted, Mr. Nazzal will live with his wife, Amneh Taube, and two daughters, Lameese Nazzal and Mariam Nazzal, who reside at 181 Woodcrest Drive, Dearborn, Michigan 48124.   This is a private residence where he has the ability to quarantine for 14 days. Mr. Nazzal has a large family who will fully support

---

[31]   https://www.afge.org/article/a-bop-officer-contracted-coronavirus.-he-was-told-to-return-to-work-asap/

him. He has the ability to secure medical insurance once he is released, and will be able to

address any and all medical needs.

## Conclusion

Mr. Nazzal asks for the mercy of the court to allow him to self isolate during this pandemic, and respectfully requests that this Honorable Court take this opportunity to grant a reduction in his sentence based on extraordinary and compelling reasons.

WHEREFORE, and for all of the reasons argued in this Petition, Mr. Nazzal requests that this Honorable Court:

A. Schedule an immediate hearing, done remotely, via Polycom, Zoom, or a similar online, video conference method;

B. In the alternative, Mr. Nazzal requests that the Court render a decision on the Pleadings in this Case, without oral argument;

C. Order Mr. Nazzal from the BOP immediately.

Respectfully Submitted,

**SATAWA LAW, PLLC**

*/s/ Mark A. Satawa*
_____
Attorney for Defendant
26777 Central Park Blvd, Suite 300
Southfield, Michigan 48076
Phone: 248-356-8320
E-Mail: Mark@satawalaw.com

Date: June 8, 2020