UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        CRIM. NO.   10-20392

    Plaintiff,

        HON. DAVID M. LAWSON

v.

HUSSEIN NAZZAL,

    Defendant.
_____/

## RESPONSE TO MOTION FOR REDUCTION IN SENTENCE

Hussein Nazzal moves for compassionate release under 18 U.S.C. §3582(c)(1)(A), citing a generalized fear of the COVID-19 virus. His motion should be denied. Nazzal's potential health risks are being addressed through his designation in a special quarantine housing assignment at FCI Milan, where he has been living, asymptomatically, since April 15.

### Background and Procedural Posture

Nazzal stands convicted of seven federal crimes under two different indictments in this district: the instant case (10-20392) and one before Judge Battani (11-20759).

Following a multi-week jury trial, Nazzal was found guilty on all six counts in case number 10-20392. Over a period of several years, Nazzal conspired with

1

others to defraud Detroit-area banks using fraudulent financial documents. They also bribed a bank officer to approve loans for unqualified third parties and took various steps to conceal their crimes. *See United States v. Nazzal*, 607 F. App'x 451, 452-53 (6th Cir. 2015). Nazzal received a below-guidelines sentence of 110 months. His subsequent appeal and §2255 motions were unsuccessful.

Nazzal's 110-month sentence was to run concurrent to his 33-month sentence in case number 11-20759, the facts of which were recounted by the Sixth Circuit Court of Appeals in *United States v. Nazzal*, 644 F. App'x 655 (6th Cir. 2016). Nazzal pled guilty to conspiracy to defraud the United States for helping arrange several fraudulent marriages. *Id*. at 657. The United States alleged that Nazzal physically and sexually abused Z.C. and H.M., a woman formerly employed at one of his restaurants and her minor son, respectively, in order to keep them from reporting Nazzal's activity. *Id*. At the time of Nazzal's abuse, H.M. was a young boy, approximately 10 years old. The Presentence Investigation Report included as "offense conduct" the marriage between a co-defendant and Z.C., physical and sexual abuse of Z.C. and H.M. by Nazzal, threats by Nazzal to report Z.C. and H.M. to the immigration authorities, and Z.C.'s work in Nazzal's restaurant without pay. *Id*. Z.C. and H.M. were also identified as victims in the PSR's "victim impact" section.

Z.C. and H.M. testified at sentencing. H.M. testified that Nazzal kept his and

Z.C.'s immigration papers and threatened to deport and otherwise harm them if they ever told anyone about his conduct. Z.C. testified that Nazzal abused and threatened her after she married Nazzal's friend and co-defendant, saying she owed him money and forcing her to work in Nazzal's restaurant and have sex with Nazzal. *See id*. The district court granted restitution of $79,107 to Z.C. and $222,399 to H.M. under the Victim Witness Protection Act. The court of appeals upheld these restitution awards, finding that "Nazzal's actions were clearly criminal, and it was not plain error for the district court to find that Nazzal's abuse of Z.C. and H.M. was part of his efforts to conceal the conspiracy." *Id*. at 660. Nazzal has not paid any of the restitution owing to these victims. He still owes approximately $1 million in restitution in the instant case.

Nazzal is incarcerated at FCI Milan. His anticipated released date is November 27, 2021. Nazzal's prison disciplinary record states that he was cited in January 2016 for refusing to obey and order and being insolent to a staff member.

In mid-April 2020, inmates at FCI Milan who were identified as being potentially at risk for COVID-19 by Health Services were assigned to live in C-Unit. The entire purpose of C-Unit is to mitigate possible exposure for these at risk inmates. Nazzal has been housed in C-Unit since April 15, 2020. Orderlies work daily to maintain a high state of sanitation inside of C-Unit. Nazzal volunteered to be an orderly, and in fact, is the head orderly for all of C-Unit. C-Unit is comprised

of single and double cells. Nazzal is housed in a double cell, and his cellmate is also a C-Unit orderly.

In C-Unit, all meals are served directly to the inmate, in his assigned cell, by a staff member wearing proper PPE. Out of cell time is limited. Three cells at a time (at most, 6 inmates) are permitted out of cell for a period of 30 minutes. During their out of cell time, inmates can use the phone, email, shower or watch television. At the end of 30 minutes, the inmates return to their C-Unit cell assignments. During their out of cell time, inmates must maintain a physical distancing of at least 6 feet and must wear their cloth face mask at all times.

At the end of a particular group's 30-minute out of cell period, the unit orderly sanitizes and disinfects the unit common areas that were visited by that group of inmates. Orderlies were properly trained by Health Services. Once the common areas have been sanitized, the next group of three cells is released for the next group of inmates to enjoy their out of cell time. This process is repeated until all inmates have received their out of cell time. Cleaning chemicals are issued daily so inmates can maintain their assigned cells with a high state of sanitation.

Inmates in C-Unit (and all housing units at FCI Milan) are tested if they show any signs or symptoms of COVID-19. Inmates are also tested if they have an exposure risk (*i.e.*, a cellmate of an inmate who tested positive will also be tested). BOP personnel have advised that there has not been a positive inmate from

4

C-Unit since the middle of April, around the time when C-Unit was converted to the housing unit for potentially at-risk inmates. Some inmates have been sent to isolation from C-Unit who have displayed signs or symptoms of COVID-19; in every instance, their respective tests have come back negative.

Nazzal has not shown any signs or symptoms of COVID-19, and he does not claim to be COVID-19 positive. Rather, he cites general concerns about COVID-19. Nazzal is age 65 and references various long-time health conditions. The Court may recall that Nazzal's health problems were no obstacle to committing the crime in the first place: trial testimony established that issues with Nazzal's "blood sugar" were accommodated during the fraud against Comerica, when Nazzal refused to go in the elevator at the Renaissance Center, and documents had to be brought down to him on the first floor. (R. 241: Trial Transcript, PgID 3845).

Nazzal, through counsel, appears to have made a request for reduction in sentence from the warden through a letter dated May 6, 2020. His instant motion includes as an exhibit an email exchange between his counsel and a representative of the BOP dated May 6 concerning his request. The warden denied Nazzal's request for reduction in sentence on May 18.

Nazzal filed his initial motion for compassionate release in this Court on May 13, 2020. The matter was fully briefed, and this Court conducted a hearing via Zoom videoconferencing software on June 3. At the conclusion of the hearing, this Court

denied Nazzal's motion without prejudice, given his failure to exhaust his administrative remedies. Nazzal filed the instant motion on June 8. The United States was ordered to respond by June 9.

**Nazzal Has Not Met the Requirements For Compassionate Release.**

I.

Section 603(b) of the First Step Act of 2018 amended 18 U.S.C. §3582 to afford inmates the right to seek compassionate release on their own motion, when previously only the Bureau of Prisons' Director could do so. However, an inmate may do so only after he has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on his behalf, or the lapse of 30 days from the receipt of such a request by the warden of defendant's facility, whichever is earlier. The United States does not contest that Nazzal has satisfied Section 3582(c)(1)(A)'s exhaustion requirement, because 30 days now have lapsed from when he submitted his request for compassionate release to the warden.

II.

Compassionate release is an extreme remedy that allows a sentencing court to modify an inmate's sentence only for "extraordinary and compelling reasons," which the inmate has the burden of showing. 18 U.S.C. §3582(c)(1)(A); *see also United States v. Collins*, No. 17-20360 (Dkt. 104; PgID 652) (E.D. Mich. May 7, 2020) (Lawson, J.). Nazzal seeks compassionate release based on his age (65) and

the following medical conditions: diabetes, cardiovascular risks, asthma, benign hypertrophy of prostate, and high blood pressure. *See* Def. Mot. at 1-2.

After misleadingly suggesting that he has cancer in his opening filing, Nazzal now concedes that his condition is actually "benign prostatic hypertrophy," which is an enlarged prostate. An enlarged prostate is not one of the CDC's COVID-19 risk categories.

The CDC does recognize a heightened risk category for "serious heart conditions," but there is no evidence that Nazzal has one. Nazzal cites a cardiac catherization procedure that took place some 9 years ago. *See* PSR at ¶¶51, 53. According to Web MD, a cardiac catherization "is a is a procedure that allows your doctor to see how well your blood vessels supply your heart." https://www.webmd.com/heart-disease/guide/cardiac-catheterization1#1 It is a medical test; there is no evidence that Nazzal's July 2011 procedure was anything other than that. Nor is Nazzal's hypertension a COVID-19 risk factor. The CDC lists "pulmonary hypertension" as a "serious heart condition" that may place individuals at greater risk, but the CDC does not include regular hypertension on the list. *See* CDC Website, People at Higher Risk. Nazzal appears to have garden-variety high blood pressure: his hypertension is classified as "benign, essential" not "pulmonary," in his medical records. As another judge in this district recently noted,

7

"at best, the evidence regarding non-pulmonary hypertension is unclear." *Malam, et al v. Alducci*, 20-10829 (E.D. Mich. May 12, 2020), at p. 22 (Levy, J.).

Nazzal has asthma. But during a medical examination on March 5, 2020, Nazzal reported that it "does not affect daily activities." Exhibit D (sealed) to May 26, 2020 Govt. Resp. [Dkt. 285]. His condition appears to be well-managed with an albuterol inhaler. *Id*. Although he makes conclusory statements that his asthma is "severe," he does not support this pronouncement with evidence. There is nothing in the record to suggest that his asthma rises to the "moderate" or "severe" grades of asthma which are recognized by the CDC as triggering the heightened risk that this Court previously examined in *Collins*. As a further testament to his productive condition, Nazzal recently volunteered for a job as a unit orderly, cleaning the facility. His ability to perform these sanitation tasks confirms that he is not frail, feeble, or particularly infirm.

Finally, Nazzal has type II, adult-onset (no insulin required) diabetes. *See* PSR at ¶51. This COVID-19 risk factor might, in some circumstances in other institutional environments, satisfy the criteria for extraordinary and compelling reasons for release. But the preventative measures taken by the BOP are having a significant impact on decreasing the infection rate at Milan FCI, and Nazzal has been benefitting from additional, special protections in his housing environment in C-Unit. The institutional factors favor his continued confinement.

Conditions at Milan FCI are steadily improving. Milan FCI had its highest number of COVID-19 positive inmates pending recovery about seven weeks ago, on April 20 (38 inmates). As time has passed, that initial outbreak has slowed, and the infection rate has significantly decreased. As of yesterday, 8 inmates at Milan FCI were positive for COVID-19 and pending recovery. It is widely known that 3 Milan inmates have died. The most recent fatality occurred well over a month ago, on April 30. That inmate fell ill and was hospitalized nearly two months ago, on April 11. The special designation of C-Unit to quarantine potentially higher risk inmates occurred a few days later, on April 15. Data from several weeks ago simply does not reflect the improved, current reality.

As discussed above, Nazzal has been quarantined in C-Unit since April 15. Out of cell time is limited and rotated to minimize interaction among inmates. Cloth masks are required. Meals are served to inmates in their cells by staff wearing full PPE. Sanitation is the highest priority. Nazzal has ready access to disinfectant as the head orderly in charge of unit sanitation – a position for which he volunteered.

The numbers at FCI Milan have been steadily declining for a month now. The median incubation period for COVID-19 is 4-5 days. https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html If Milan was overrun with myriad unknown asymptomatic cases, the disease would have continued to manifest symptomatically, and it would have done

9

so quickly, given the short incubation period. That has not happened. Moreover, no inmate has tested positive from C-Unit since around the time Nazzal moved there, in mid-April. This includes any C-Unit inmate displaying signs or symptoms of the disease.

Nazzal has not put forth any convincing evidence to demonstrate that he is at an especially elevated risk of harm in the present situation of confinement in his special quarantine housing assignment in C-Unit, and he has not demonstrated "extraordinary and compelling reasons" to reduce his sentence to time served.

III.

In addition, the person being released must "not [be] a danger to the safety of any other person or to the community." USSG §1B1.13(2). And even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. §3553(a). *See* 18 U.S.C. § 3582(c)(1)(A).

Nazzal is not a one-off, one-time fraudster. He exploited a commercial borrowing system intended for small businesses, repeatedly defrauded the commercial title insurance system, devised sophisticated lien-jumping schemes, and used false documents and false testimony in the civil judicial system, all as part of a seemingly inexhaustible pursuit of dishonest money. Nazzal's crimes were not the

result of a single decision or a momentary impulse. These were calculated and deliberate crimes orchestrated over the course of many years. Given the difficulties in uncovering and prosecuting such fraud, the deterrent impact of a prison sentence is critical to the integrity of the nation's financial system. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

An examination of Nazzal's history and characteristics should include consideration of his immigration fraud offense, which underscores his dangerousness. His immigration fraud conspiracy included repeated physical and sexual assaults against waitress Z.C. and her minor son, H.M. The United States did not blind-side Nazzal at sentencing. At Nazzal's December 20, 2011 detention hearing, Special Agent Chesla testified at length about information that he had acquired about Nazzal's various assaultive conduct. *See* Detention Hearing Tr. (R. 129; PgID 756-764). In fact, Special Agent Chesla testified not only about Z.C. and H.M., but also about another Kabob Village waitress who reported to Special Agent Chesla that Nazzal had sexually assaulted her, but later paid her a $20,000 settlement in exchange for her agreement not to pursue criminal charges against him. *See id.* at PgID 751, 753. As noted above, the allegations as to Z.C. and H.M. were set forth by the Probation officer in the PSR. Although Nazzal initially objected to their

11

inclusion in his report, he ultimately withdrew his objections. *Nazzal*, 644 F. App'x at 657.

Nazzal complains that Z.C. and H.M.'s allegations are "unchallenged" and have not been "vetted." But they survived examination by the Court of Appeals for the Sixth Circuit, and that scrutiny resulted in a finding that "Nazzal's actions were clearly criminal, and it was not plain error for the district court to find that Nazzal's abuse of Z.C. and H.M. was part of his efforts to conceal the conspiracy." *Id.* at 660. It bears repeating that Nazzal has not paid one cent of the $300,000+ in restitution that he owes to Z.C. and H.M.

During allocution at sentencing, Nazzal claimed "I done everything by the book." (R. 247: Sentencing Transcript, PgID 4651). This Court emphatically rejected this suggestion:

> The amount of the fraud involved here was extensive. The nature of the conduct was, with all due respect to Mr. Nazzal, not by the book. In fact, it was contrary to the book that we are governed by.

(*Id.*, PgID 4652). This Court commented that it received and considered a number of letters in support of Nazzal (*Id.*, PgID 4646), and further noted: "And the letters do paint a different picture, and surely, they show that Mr. Nazzal has committed random acts of kindness throughout his career here and his participation. They do collide with the evidence at trial, however." (*Id.*). This Court went on to address Nazzal's criminal record, the fact that "Mr. Nazzal had involved [others] in conduct

12

and pushed them over the edge," the "extensive loss" in the case, and the need to promote respect for the law and deterrence. (*Id.*, PgID 4652-53). Nazzal's 110-month sentence was well-deserved, and it continues to be well-supported by the §3553(a) factors.

Prior leniency in his first criminal conviction (PSR at ¶37) did nothing to deter Nazzal from committing additional, far more serious, federal crimes. After hearing from victims Z.C. and H.M., Judge Battani imposed a sentence at the top of the applicable guideline range. Nazzal's reprehensible conduct with respect to those two victims should not be overlooked in considering whether he is the kind of person who deserves compassionate release.

## Conclusion

Nazzal's motion should be denied.

    Respectfully submitted,

    MATTHEW SCHNEIDER
    United States Attorney

    *s/Erin S. Shaw*
    Assistant United States Attorney
    211 West Fort St. Suite 2001
    Detroit, Michigan 48226
    (313) 226-9182
    erin.shaw@usdoj.gov

Dated: June 9, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2020, I caused the foregoing document to be electronically filed with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Mark Satawa, Counsel of Record for Defendant

<i>s/ Erin S. Shaw</i>